UNITED STATES DISTRICT COURT                c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JESSE JAMES WALLACE            CIVIL ACTION NO. 1:16-CV-00706

VERSUS                        JUDGE TRIMBLE

CAROLYN W COLVIN              MAGISTRATE JUDGE PEREZ-MONTES

_____

REPORT AND RECOMMENDATION

Jesse James Wallace ("Wallace") filed an application for Social Security Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") on July 25, 2013.[1] (Doc. 9-1, pp. 11, 132-55). Wallace alleged a disability onset date of October 12, 2012. (Doc. 9-1, p. 207). In a prehearing brief, Wallace moved to amend the onset date to May 14, 2013. (Doc. 9-1, pp. 27, 280). Wallace's DIB and SSI claims were initially denied by the Social Security Administration on January 8, 2014. (Doc. 9-1, pp. 11, 58, 70).

A *de novo* hearing was held on August 20, 2014, before an administrative law judge ("ALJ"). Wallace appeared with Suzette Tagesen-Murphy, attorney for claimant. Beverly K. Majors, a vocational expert ("VE") also testified. (Doc. 9-1, pp. 11, 24). The ALJ denied Wallace's claim on November 24, 2014. (Doc. 9-1, pp. 8-19). The ALJ found that Wallace's lumbago, cervicalgia, cervical disc degeneration, and gout were "severe impairments" at step 2. (Doc. 9-1 pp. 13-14). The ALJ further found that Wallace's headaches and hypertension were not severe. (Doc. 9-1, p. 14). The

_____

[1] The applications indicate a filing date of August 11, 2013. (Doc. 9-1, pp. 132-55). However, the notice of hearing and the ALJ's decision give a filing date of July 25, 2013. (Doc. 9-1, pp. 11, 109).

ALJ further found that these impairments did not meet the requirements of a listed impairment. (Doc. 9-1, pp. 14-15). The ALJ also determined Richardson's residual functional capacity ("RFC") and concluded that he was able to perform light work that required only occasional climbing, balancing, kneeling, stooping, crouching, and crawling. (Doc. 9-1, pp. 15-18). The ALJ further found that Wallace was able to perform his past relevant work as a security guard as normally performed in the national economy. (Doc. 9-1, pp. 18-19). The ALJ cited to the VE's description of the job as semi-skilled in nature, light in exertion. (Doc. 9-1, pp. 18, 54). As Wallace had the RFC for his past relevant work, the ALJ found that he was not disabled. (Doc. 9-1, p. 19).

On March 22, 2016, the Appeals Council denied Wallace's request for review, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner"). (Doc. 9-1, pp. 1-4).

Wallace next filed this appeal for judicial review of the Commissioner's decision. Wallace argues that the ALJ's decision was not supported by substantial evidence, and that the ALJ did not follow the correct legal standards in evaluating Wallace's credibility. (Doc. 15).

The Commissioner filed a brief in response to Wallace's appeal. (Doc. 16). Wallace did not file a reply. Wallace's appeal is now before the Court for disposition.

Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits,

2

and be disabled as defined by the Social Security Act.  See 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(2).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

3

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981); <u>see also</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

I.    <u>Summary of Pertinent Facts</u>

Wallace was 56 years old when he applied for DIB and SSI on July 25, 2013. Wallace has a high school education. He worked as a school custodian, dishwasher, carpet cleaner, panel assembler, and security guard. (Doc. 9-1, pp. 52-54).

A.    <u>Medical Records</u>

On July 8, 2011, Wallace presented to Dr. Martin Carter ("Dr. Carter") with complaints of back pain and a cold. Dr. Carter and Dr. Wyche T. Coleman ("Dr. Coleman") work at the same location. Wallace stated he had chronic back pain since a work injury. He was assessed with low back pain, and given medication. (Doc. 9-1, p. 481).

On September 1, 2011, Wallace presented to Dr. Coleman with complaints of continued neck, mid and low back pain, secondary to a work injury, and that he had some radicular symptoms of his right arm and right leg. An MRI was requested, and medication given. (Doc. 9-1, p. 478).

On September 13, 2011, Wallace presented to Dr. Coleman for follow-up for neck and back pain. Dr. Coleman noted that Wallace continued to have radicular symptoms in the right upper and right lower extremities, and that Wallace had an MRI done of his cervical, thoracic, and lumbar spine. Dr. Coleman noted that there was MRI evidence of multi-level disc disease in the cervical and lumbar spine, and that he would request a neurosurgical consultation. (Doc. 9-1, p. 475).

On September 30, 2011, Wallace presented to Dr. Carter with complaints of neck and back pain, which Wallace stated was being affected by the change in weather. Dr. Carter noted that Wallace had an upcoming neurosurgical appointment for evaluation of his persistent neck and back pain with radicular symptoms. Dr. Carter additionally noted that there were no new weakness, numbness, or tingling. He was assessed with osteoarthritis and neck and back pain that was likely due to cervical disc injury that was awaiting consultation with neurosurgery. (Doc. 9-1, p. 473).

On October 13, 2011, Wallace was seen by Dr. Carter for complaints of neck and back pain. It was noted that Wallace had an upcoming appointment with Dr. Guthikonda, a neurosurgeon, later that month. Wallace had no weakness, numbness, or tingling, and otherwise his neck and back pain was stable. (Doc. 9-1, p. 471).

On October 19, 2011, Wallace visited University Neurosurgery for a new patient office visit. Wallace's chief complaint was neck pain, shoulder pain, low back pain, and right leg pain, numbness, and tingling. (Doc. 9-1, p. 323). He complained of headaches as well. (Id.). He was assessed with a herniated lumbar disc, lumbosacral radiculopathy, and cervical spinal stenosis. (Doc. 9-1, p. 324). Physical therapy and medication was recommended, as well as a follow up in six to eight weeks for reassessment. (Id.).

On October 24, 2011, Wallace was seen by Dr. Coleman for follow-up for chronic neck and back pain. Dr. Coleman noted there was MRI evidence of multi-disc disease in the cervical lumbar spine, and that Wallace had been recommended physical therapy and conservative treatment. Dr. Coleman noted that he had completed a physician's statement for extended sick leave. (Doc. 9-1, p. 469).

On the initial plan of care for physical therapy treatment that began on October 26, 2011, Wallace reported that on April 18, 2011, he was throwing trash over his right shoulder and injured the right side of his neck while at work. Wallace reported that the pain in his neck "shoots down" to his right shoulder blade and also "shoots" to the right side of his waist. He additionally complained of frequent headaches along with low back pain. He stated that his pain rating was currently a 5/10, and a 7/10 at its worst. He stated that medications and rest eased his pain, and is worsened when he bends over to pick objects up. (Doc. 9-1, p. 306). His diagnoses included pain in cervical and lumbar areas, decreased range of motion and flexibility, decreased strength, soft tissue dysfunction, postural dysfunction, improper body

mechanics, difficulty ambulating, abnormal gait, decreased coordination, and decreased transfer status. (Doc. 9-1, p. 307).

On November 3, 2011, Wallace presented to Dr. Coleman for follow-up regarding his cervical stenosis, lumbar radiculopathy, and herniated lumbar disc secondary to previous injury. He noted that Wallace had been seen by Dr. Guthikonda, who had recommended physical therapy, which Wallace had been receiving. (Doc. 9-1, p. 467).

On December 2, 2011, Wallace presented to Dr. Carter with complaints of neck and back pain following an injury at work. Wallace stated that he had been going to physical therapy and that his pain was improving, but had episodes where the pain would get worse. He had no new weakness, numbness, or tingling. He was assessed with mechanical low back pain, mechanical neck pain, and sinusitis. He was given medication, directions to return to the clinic, and directed to make an appointment with Dr. Guthikonda and to continue physical therapy (Doc. 9-1, pp. 464-65).

On December 13, 2011, Wallace presented to Dr. Coleman for a follow-up of his neck and back pain. Dr. Coleman noted that he has a diagnosis of herniated lumbar disc, lumbosacral radiculopathy, and cervical spinal stenosis, and that Wallace had an appointment scheduled later that month with Dr. Guthikonda. (Doc. 9-1, p. 462).

On December 28, 2011, Wallace visited University Neurosurgery. His diagnoses included cervical stenosis of spinal canal, lumbar stenosis, and lumbar radiculopathy. (Doc. 9-1, p. 320). Wallace reported having low back and right lower extremity pain/numbness/tingling with neck and shoulder pain. (Doc. 9-1, p. 320).

On the initial plan of care for his physical therapy treatment that began on January 6, 2012, Wallace indicated that he injured his neck on April 28, 2011 at work. Wallace complained of increased headaches and radicular symptoms in the right scapula and right UE. He advised that his pain rating was currently a 5/10 and a 7/10 at its worst. Wallace additionally advised that the pain is eased with medications, and worsens with increased range of motion. (Doc 9-1, p. 304). The diagnoses included pain in the c-spine, decreased range of motion and flexibility, decreased strength, soft tissue dysfunction, postural dysfunction, improper body mechanics, and decreased proprioception. (Doc. 9-1, p. 305).

On February 10, 2012, Wallace visited Dr. Coleman for follow-up. Dr. Coleman noted he had a neurosurgical evaluation by Dr. Guthikonda, and had been receiving physical therapy. Dr. Coleman additionally noted that he had known stenosis of C4 and C5, with moderate stenosis at L4, L5, and disc disease. Dr. Coleman stated that Wallace had been having headaches, but that a CT scan of his brain was negative. He stated that Wallace has been improving with physical therapy, and that his neck and back pain were improving along with his headaches. Dr. Coleman assessed Wallace with a headache, which was probably musculoskeletal in nature due to the negative CT, as well as neck and back pain. (Doc. 9-1, p. 458).

On March 2, 2012, Wallace visited Dr. Carter for complaints of continued neck and back pain. Dr. Carter noted that a CT on February 6, 2012 showed no abnormality, but that he had a normal anatomic variation deemed to be of no clinical

significance. He was assessed as having chronic back pain, and noted to have an appointment with Dr. Guthikonda on March 28, 2012. (Doc. 9-1, p. 456).

On March 5, 2012, physical therapy progress notes indicated that Wallace had stated he had been doing well until the prior week, when he was sick and his neck pain came back. Wallace also stated that he continues to have headaches from time to time. He indicated his pain level was a 3-4/10. It was recommended that Wallace continue phyiscal therapy two to three times a week for four weeks. (Doc. 9-1, p. 302).

On the April 2, 2012 physical therapy discharge summary, Wallace reported he continued to have pain in his c-spine, but the severity of the pain had decreased. According to the discharge summary, he had been admitted on January 6, 2012 for physical therapy and received twenty-one treatments. His pain rating at evaluation was a 5-7/10, while his pain rating at discharge was 3/10. (Doc. 9-1, p. 290)

Wallace visited University Neurosurgery on May 23, 2012, for follow-up after his physical therapy treatment due to neck pain that radiated to the head, and bilateral hand numbness/tingling. Wallace reported his symptoms were worsening. His diagnoses included cervical stenosis of the spinal canal, cervicalgia, and cervical radiculopathy. (Doc. 9-1, p. 312). The physician noted that range of motion was normal, but tenderness was present at the midline posterior cervical. (Doc. 9-1, p. 313). He was advised to follow up in about three months. (Doc. 9-1, p. 315).

On June 5, 2012, Wallace visited Dr. Coleman for complaints of a painful left great toe and second toe with swelling. Dr. Coleman noted that Wallace has a history of neck and back pain, and that Wallace stated that he had an upcoming appointment

9

to have cortisone injections in his neck. Dr. Coleman's assessment included gouty arthritis in Wallace's left great toe, and neck and back pain which was being treated by Dr. Guthikonda. (Doc. 9-1, pp. 452-53).

On June 12, 2012, Wallace was seen at University Health – Shreveport. He presented with several months of continued neck pain following a work injury. He reported radiation to the head with associated headaches, but denied radiation to the arms. He also denied numbness, tingling, or weakness in the upper extremities. He received a cervical steroid injection without any complications. (Doc. 9-1, p. 404). Wallace had a final diagnosis of cervical stenosis of the spine. (Doc. 9-1, p. 408).

On June 15, 2012, Wallace visited with Dr. Coleman with complaints of continued neck and back pain. Dr. Coleman noted that Wallace had known MRI evidence of multi-level disc disease in the cervical and lumbar spine, and that he continues to be followed by Dr. Guthikonda, and that he has been treated conservatively with physical therapy and medication. (Doc. 9-1, p. 454).

On June 21, 2012, Wallace visited Dr. Coleman with complaints of neck and back pain. (Doc. 9-1, p. 451).

On July 5, 2012, Wallace visited Dr. Coleman for follow-up on his neck and back pain. Dr. Coleman noted he was undergoing epidural injections in a series per Dr. Guthikonda's recommendation. Additionally, Dr. Coleman noted that there was MRI evidence of multi-level disc disease of the cervical and lumbar spine. (Doc. 9-1, p. 342).

On August 3, 2012, Wallace visited Dr. Carter, complaining of neck and back pain, as well as some pain in his left arm. Dr. Carter noted that Wallace had been at LSU for an epidural injection. (Doc. 9-1, p. 340). Dr. Carter additionally noted that review of Wallace's narcotic use revealed that he had been getting narcotics from both him and Dr. Coleman independently, and that the refills have been more frequent than prescribed. (Doc. 9-1, p. 340).

On August 8, 2012, Wallace presented for follow-up at University Health-Shreveport. In the progress notes, Wallace reported head pains bilaterally behind his ear, mild neck pain, and some LUE numbness. (Doc. 9-1, p. 331). He had an examination with Dr. Guthikonda. His diagnoses included cervical stenosis of spine, head ache, and left arm numbness. (Doc. 9-1, pp. 316, 333). His range of motion was decreased, and rotation was mildly limited. (Doc. 9-1, pp. 318, 332). He was advised to follow up in about six months. (Doc. 9-1, p. 319).

On August 21, 2012, Wallace visited Dr. Coleman for follow-up on his chronic neck pain. Dr. Coleman noted that conservative therapy, including physical therapy, has been performed, but that Wallace continues to have pain. That day, Wallace additionally complained of pain in his right hip radiating down his right leg. Dr. Coleman noted that Wallace has had one epidural injection, and was supposed to have two more. Wallace was assessed with chronic neck pain secondary to cervical disc disease and cervical stenosis. (Doc. 9-1, p. 338).

On August 28, 2012, Wallace visited Dr. Coleman's office. He presented with a history of head, neck, and leg pain. (Doc. 9-1, p. 337).

On September 9, 2012, Wallace visited Dr. Coleman's office. He presented with a history of neck and hip pain. (Doc. 9-1, p. 336).

On September 19, 2012, Wallace presented to Dr. Carter with exacerbation of neck and hip pain, ongoing for several months. Wallace noted he saw Dr. Guthikonda the prior month for epidural steroid injections, and that he had an upcoming appointment for another but that he is unable to wait that long due to the pain. Wallace noted no weakness, numbness, or tingling. Medication was continued and Dr. Guthikonda's office was contacted to see if the appointment could be moved sooner. (Doc. 9-1, p. 486).

On October 23, 2012, Wallace visited Christus Coushatta Health Care with a complaint of foot pain. (Doc. 9-1, p. 352). The physician diagnosed him with gout and gave him a prescription and directions to follow up with his primary care physician in 24-48 hours. (Doc. 9-1, p. 353; 358).

On July 1, 2013, Wallace visited the Natchitoches Outpatient Clinic for a pre-employment evaluation. (Doc. 9-1, p. 364). The assessment was of a normal pre-employment screening examination. (Doc. 9-1, p. 365).

On October 30, 2013, Wallace visited the Natchitoches Outpatient Clinic and was examined by Dr. Joan Walker ("Dr. Walker"). (Doc. 9-1, p. 362, 444). He had a complaint of frequent headaches that had been getting worse over the last few months.  (Doc. 9-1, pp. 363, 444). He diagnoses included headache, gout, and cervical disc degeneration. (Doc. 9-1, p. 444).

On December 21, 2013, Wallace received a medical consultative examination from Dr. Matthew Clavenna at Southern Medical Group. (Doc. 9-1, pp. 367, 370). Wallace's chief complaint was of disability secondary to neck injury and gout of the right foot. (Doc. 9-1, p. 370). Wallace reported neck problems beginning in April 2011 following a work related injury. He reported that the pain moved from neck to back, and left leg weakness and pain that waxed and waned. The report noted that Wallace had undergone steroid injections to the neck with some improvement, but Wallace stated that he is unable to perform normal physical activities due to left leg and back pain. The report notes he never had a MRI or surgery for these problems. The report additionally notes that Wallace's gout started two years prior, and mainly occurs on the right foot a few times a year. (Doc. 9-1, p. 370). The report indicates that Wallace is independent with his activities of daily living, except the more strenuous chores. (Id.). He was diagnosed with neck, lower back, and left leg pain, likely a mild herniated disc/sciatica, and gout. (Doc. 97-1, p. 372).

The physician noted that based on the examination and objective evidence, that Wallace should be able to sit, walk, and/or stand for a full workday, hold a conversation, respond appropriately to questions, and carry out and remember instructions. The physician additionally noted that Wallace did not appear to need an assistive device at the time, as his neck, back, and leg problems appeared to be fairly well controlled, although he may be somewhat limited to more strenuous activity, such as lifting and carrying heavy items greater than 20 pounds. (Doc. 9-1, p. 372).

On January 14, 2014, Wallace presented for a follow up with Dr. Walker for his complaints of back pain and headaches. Wallace's diagnoses included cervicalgia, lumbago, and gout. (Doc. 9-1, p. 442).

On February 25, 2014, Wallace was examined by Dr. Walker, for follow up for his headaches, back, and neck pain. His diagnoses included acute sinusitis, lumbago, and cervicalgia. (Doc. 9-1, pp. 439-40).

On April 21, 2014, Wallace was examined by Dr. Walker, with a complaint of headache, neck pain, and left foot pain. His diagnoses included acute sinusitis, lumbago, cervicalgia, cervical disc degeneration, and gout. (Doc. 9-1, p. 437).

On July 15, 2014, Wallace had a follow-up with Dr. Walker. He was assessed with benign essential hypertension, lumbago, cervicalgia, and cervical disc degeneration. (Doc. 9-1, p. 447). He was advised to follow-up in two weeks. (Id.).

**Administrative Hearing**

At his August 2014 administrative hearing, Wallace testified that he was 5'6" and about 169 pounds. (Doc. 9-1, p. 48). He stated that he was married, had no children under the age of 18, and had a twelfth grade education. (Doc. 9-1, p. 35). He stated he had some problems reading and writing, and that he took special education courses, with the exception of PE. (Doc. 9-1, pp. 35-36).

Wallace stated that on April 18, 2011, he was throwing the trash in the dumpster when he pulled something in his neck. He stated that the day after, he could not turn his neck. Wallace then visited Dr. Coleman, who examined his neck, prescribed him medication, and advised him to complete an MRI. (Doc. 9-1, pp. 36-

14

37). Wallace additionally stated he had headaches, which started about two days after the accident, and lower back problems (Doc. 9-1, p. 37). Wallace stated that physical therapy and medication helped a little bit, but that he would soon have the same problems. (Doc. 9-1, p. 37). Wallace stated that Dr. Coleman referred him to Dr. Kudaconda[2], who advised him that he had a pinched nerve and needed surgery, but first he tried an injection. Wallace stated the injection helped, but that it wore off after about a week, leaving him in the same kind of pain. (Doc. 9-1, p. 38). Wallace stated that the surgery was recommended in mid-2012, but that he did not have the surgery because of the risk factors. (Doc. 9-1, p. 39). Dr. Kudaconda advised him that without the surgery that he would be on the medication for the rest of his life. (Id.). Wallace later stated that he is thinking about getting the surgery. (Doc. 9-1, p. 45).

Wallace advised that he currently has problems sitting for a long period of time, his legs go out on him, and he has headaches. He advised that he could sit for about thirty minutes before he would have to get up and walk around. He stated that both sitting and standing irritates him if he does it for too long. (Doc. 9-1, p. 40). His headaches occur about once or twice a week, and have worsened, causing him to need to take medication and lay down when he gets a headache, and that he is unable to do anything else when they occur. (Doc. 9-1, pp. 40-41).

Wallace testified that he is working at a job through IODA beginning in May 2013.[3] (Doc. 9-1, p. 29). Wallace testified that IODA is available for elderly people

---

[2] This is a phonetic spelling from the testimony given, and it most likely refers to Dr. Guthikonda. This section will reflect the spelling found in the transcript.

[3] In the transcript and the Appellants Brief, counsel clarified that this was the ANPPM Senior Community Service Employment Program, a part time job training program where Wallace worked

who cannot do full-time work, but instead do light-duty work. He worked at MLK Head Start for about fourteen months, four days a week, for four hours a day. (Doc. 9-1, p. 30). Wallace testified that the records indicated that he was a housekeeper or custodian, but that the duties he completed were not typical housekeeping duties, as he mostly sat all day, with some standing when he had to run an errand for a teacher, but otherwise the school had its own custodian. (Doc. 9-1, p. 31). He stated that sometimes he carried a book to the library, or copied materials, but there was no mopping, dusting, or vacuuming, with the exception of vacuuming a small contained space if something had been dropped in that area. (Doc. 9-1, pp. 31-32). After leaving MLK Head Start, he started working at a technical college, where he stated he does a little dusting and makes coffee. (Doc. 9-1, pp. 43-44).

Wallace noted that he has been prescribed gabapentin, tramadol, meloxicam, baclofen, hydrocodone, and indomethacin. (Doc. 9-1, p. 44). He stated that when he takes the medication, he cannot drive, he gets dizzy, and has to go somewhere quiet. (Doc. 9-1, pp. 44-45).

Wallace states he cannot work a normal, regular job as he cannot lift items, he has a lot of pain, has headaches, and his legs just give out on him. (Doc. 9-1, pp. 45-46). He states he can probably lift between 10 and 15 pounds. (Doc. 9-1, p. 46). He further states his son mostly takes care of his home for him and does the yard work. (Doc. 9-1, pp. 46-47). Wallace said a friend does his grocery shopping with him, but

---

18 hours per week. Participants must be low income seniors 55 years and older. (Doc. 9-1, p. 171; Doc. 15, p. 8)

that he goes along every once in a while. He stated he will sometimes walk down the aisles, but that a lot of the time he sits and watches inside the store. (Doc. 9-1, p. 47).

On a normal day, Wallace stated he gets up about 6:00 a.m., showers, gets ready for work, and takes his medication. (Doc. 9-1, p. 48). He gets to work, takes a seat, and follows the directions of a staff member. (Doc. 9-1, p. 49). He goes back home about 1:00 p.m., walks around and tries to exercise, then takes more medication and sometimes watches television. Someone brings him his food. (Doc. 9-1, p. 49).

His attorney stated she had submitted a prehearing brief, wherein the onset date of disability was amended from October 12, 2012 to May 14, 2013. (Doc. 9-1, p. 27). The attorney additionally noted that Wallace was injured at work on April 18, 2011, and continued to work for approximately a week doing light duty, but was unable to continue work, at which point the company initiated indemnity benefits. Counsel additionally stated that around October 2012, Dr. Kudaconda recommended he have a cervical disc surgery, but Wallace declined the surgery due to the risks involved. (Id.).

The VE testified that Wallace's job as a school custodian with the Natchitoches Parish School Board was medium work, SVP: 3 (DOT 382.664-010). (Doc. 9-1, p. 52). Wallace worked at Papa's Restaurants as a custodian and dishwasher. (Doc. 9-1, p. 53). The dishwashing was medium work, SVP: 2 (dot 318.687-010). (Id.) His job as a carpet cleaner was medium work, SVP: 5 (DOT 369.384-014). (Id.). Wallace's job as a panel assembler is classified as heavy work, SVP: 3 (DOT 806.684-082), but the VE noted that the way that Wallace did it was classified as medium work. (Id.). Wallace's

17

job at the casino, where he worked mainly as a security guard, was classified as light work, SVP: 3 (DOT 372.667-034). (Doc. 9-1, p. 54).

The ALJ posed a hypothetical of an individual with the same work history, who is limited to the light exertional level with no more than occasional climbing, balancing, kneeling, stooping, crouching, and crawling. (Doc. 9-1, pp. 54-55). The VE responded that the individual could perform the security guard job as the DOT describes it. (Doc. 9-1, p. 55).

Wallace's attorney asked if he had any transferable skills to sedentary work. The VE responded there would be no transferable skills to sedentary. (Doc. 9-1, p. 55). Wallace's attorney then added on to the ALJ's hypothetical, asking if the claimant was required to miss up to one day a week due to the headaches that he described earlier, would any of the jobs allow for that accommodation. The VE responded that would be more of an accommodation than any employer would allow, and there would be no jobs. (Doc. 9-1, pp. 56-57).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. § 404.1520(a) and § 416.920(a). The sequential process required the ALJ to determine whether Wallace (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding

18

that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Wallace has not engaged in substantial gainful activity since October 12, 2012, the alleged onset date, that he meets the insured status requirements of the Social Security Act through December 21, 2014, and that he has severe impairments of lumbago, cervicalgia, cervical disc degeneration, and gout, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. (Doc.9-1, pp. 13-15). The ALJ found that Wallace's headaches and hypertension were no more than slight abnormalities and are not expected to impact his ability to perform work regardless of his age, education, or work history. (Doc. 9-1, p. 14). The ALJ also found that Wallace was able to perform light work, except occasional climbing, balancing, kneeling, stooping, crouching, and crawling. (Doc. 9-1, p. 15).

The ALJ found that Wallace's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, Wallace's

statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Doc. 9-1, p. 16). The ALJ found that the evidence of record did not support Wallace's allegations, and therefore was not fully credible. In addition, the ALJ noted Wallace's drug seeking behavior, when Wallace was getting narcotic medication from both Dr. Coleman and Dr. Carter at the same time, and found that it did not bode well toward his credibility. (Doc. 9-1, p. 17). The ALJ noted that the consultative examiner noted no assistive device was necessary, that his gait and station were normal, and he had 5/5 strength in all extremities. And the ALJ further noted that in July 2013, Wallace indicated he was not taking any pain medication despite Wallace testifying to severe back pain. (Id.). The ALJ also considered that Wallace continues to work on a part-time basis, indicating he is not as disabled as he alleged. (Id.).

The ALJ further considered that on July 12, 2012, the LSU-MC physician precluded Wallace from lifting, driving, or strenuous exercise for three days, and gave some weight to the opinion. (Doc. 9-1, p. 18). The consultative examiner opined that Wallace could sit, walk, and/or stand for a full workday, as well as hold a conversation, respond appropriately to questions, and carry out and remember instructions. He did not need an assistive device, and might be somewhat limited to strenuous activity, such as lifting and carrying heavy items. The ALJ gave great weight to the opinion, but found that Wallace had postural limitations. (Doc. 9-1, p. 18). The state agency medical consultant found that Wallace could perform light work with postural limitations, and occasionally climb ramps, stairs, ladders, ropes,

scaffolds, balance, stoop, kneel crouch, and crawl. The ALJ gave great weight to the opinion as it was consistent with the record as a whole. (Doc. 9-1, p. 18).

Overall, the ALJ found that the evidence of record failed to demonstrate a greater limitation than found in the decisional residual functional capacity. The ALJ found that Wallace was capable of performing past relevant work as a security guard, as it did not require performance of work-related activities precluded by his residual functional capacity. (Doc. 9-1, p. 18).

## II.    Law and Analysis

Wallace alleges two issues: (1) the ALJ erred in her analysis and that substantial evidence does not support the ALJ's finding that Wallace's headaches are considered a non-severe impairment, and the ALJ failed to include in the RFC any limitations from Wallace's headaches; and (2) the ALJ failed to properly evaluate Wallace's credibility.

### 1.    The ALJ properly considered the evidence, and substantial evidence supports her findings.

Wallace argues that the ALJ erred by finding that Wallace's headaches were a non-severe impairment. Wallace asserts that the record shows that the ALJ was incorrect, and that Wallace's headaches are more than slight abnormalities, and would be expected to impact his ability to perform work. Therefore, the ALJ's failure to find the headaches a severe impairment are contrary to Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and 20 C.F.R. §§ 404.1520(c) and 416.920(c) and are not supported by substantial evidence.

Furthermore, Wallace argues that the ALJ failed to include any limitations from his headaches in his final RFC. Wallace states that the VE testimony shows that had the headaches and Wallace's limitations caused by those headaches been considered, the ALJ would have been compelled to grant benefits, as there would be no jobs available to someone who had to miss up to one day of work a week due to headaches.

## A. Substantial evidence supports the ALJ's finding that Wallace's headaches were not a severe impairment.

"An impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Stone, 752 F.2d at 1101. However, Wallace did not establish that his headaches have more than a minimal effect on his functionality. The burden of proof is on the claimant to prove that he suffers from a disability that qualifies him for benefits. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).

Here, the ALJ found that the record showed that Wallace complained of and was diagnosed with headaches, but that they did not result in functional limitations, and were not expected to impact Wallace's ability to perform work regardless of his age, education, or work history, and therefore were not severe. (Doc. 9-1, p. 14). In support of this finding, the ALJ noted the February 10, 2012 opinion of Wallace's treating physician, Dr. Coleman, who noted that Wallace had headaches, but found no functional limitations. The ALJ also noted treatment notes from LSU-Shreveport

confirming the headache diagnoses, but which did not mention any functional limitations. (Doc. 9-1, pp. 14, 458-59).

Although Wallace notes that the ALJ was incorrect in stating that Wallace did not mention headaches during the consultative examination with Dr. Clavenna, the ALJ did note that he complained of frequent headaches that were getting worse, and also that Wallace testified to having headaches and often complained of headaches at medical visits. Although this one remark by the ALJ was inaccurate, it was harmless as the ALJ had otherwise noted the overall amount of times he complained of headaches. Wallace has failed to show this error was harmful. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

The record as a whole demonstrates that there is substantial evidence to support the ALJ's conclusion that Wallace's headaches were not a severe impairment at step two of the process.

### B.   Substantial evidence supports the ALJ's finding of Wallace's residual functional capacity based on his impairments.

The plaintiff has the burden of proof in the first four steps of the sequential evaluation process. Therefore, he has the burden of demonstrating his functional limitations to be included in the RFC assessment. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). When determining the RFC, the ALJ is to "consider the limiting effects of all [of the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545. The ALJ "is responsible for assessing the medical evidence and determining the

23

claimant's residual functional capacity." <u>Perez v. Heckler</u>, 777 F.2d 298, 302 (5th Cir. 1985). The reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343 (5th Cir. 1998); <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995). A "no substantial evidence" finding is only appropriate if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. <u>Johnson</u>, 864 F.2d at 343-44.

The ALJ found that Wallace's headaches were not severe as they were "no more than slight abnormalities and are not expected to impact his ability to perform work regardless of his age, education or work history." (Doc. 9-1, p. 14). In support of this decision, Wallace's treating physician indicated that Wallace's headaches resulted in no functional limitations. The ALJ also gave great weight to Dr. Clavenna's opinion based on the 2013 examination, that Wallace could perform work that did not require lifting heavy objects. (Doc. 9-1, pp. 16, 18, 372). The ALJ also relied on the state agency medical consultant Dr. Lee's opinion following a review of Wallace's medical records in January 2014. Dr. Lee opined that Wallace could perform light work with postural limitations. (Doc. 9-1, pp. 18, 64-67, 77-79). Substantial evidence supports the ALJ's finding of Wallace's residual functional capacity based on his impairments.

Although the VE testified in response to a hypothetical question from Wallace's attorney that there were no jobs available to someone who would miss up to a day of work a week due to headaches, there was no objective evidence in the record supporting this limitation, just Wallace's testimony at the hearing. The ALJ is not

bound by VE testimony based upon hypothetical assumptions that did not coincide with the ALJ's findings regarding the objective medical evidence. <u>Owens v. Heckler</u>, 770 F.2d 1276, 1282 (5th Cir. 1985).

The court therefore finds substantial evidence supports the ALJ's RFC finding.

2. **<u>The ALJ performed a proper credibility analysis.</u>**

Wallace next contends that the ALJ failed to properly evaluate Wallace's credibility.

Wallace states that the ALJ conceded Wallace's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found Wallace's statements concerning intensity, persistence, and limiting effects of the symptoms "not entirely credible." (Doc. 15, citing doc. 9-1, p. 16). The ALJ's comments towards Wallace's credibility concerns Dr. Carter's comments from August 2012. Dr. Carter noted that Wallace was getting narcotic medication from both Dr. Carter and Dr. Coleman, and requested refills more frequently than prescribed, and thus "the undersigned cannot ignore the claimant's drug seeking behavior, [and] this does not bode well toward his credibility." (Doc. 9-1, p. 17).

Wallace argues that there is no evidence in the record of Wallace abusing drugs, or his physicians stating he was abusing drugs or a drug seeker. Wallace additionally notes that Dr. Coleman continued to prescribe medication even after noting he had obtained medications from Dr. Carter. (Doc. 15, citing doc. 9-1, p. 486). Additionally, Wallace reported during this time period that his symptoms were worsening. (<u>Id.</u>, citing doc. 9-1, p. 312, 404). Wallace states that the ALJ gave no

consideration to the fact the increase in medications may have been a result of his symptoms worsening, and the ALJ did not perform the legal analysis required by 20 C.F.R. §§ 404.1535 and 416.935, or otherwise note how this one comment from Dr. Carter was relevant to Wallace's testimony concerning his conditions.

The ALJ must consider the claimant's subjective complaints. However, the ALJ may find that those complaints are not credible or are exaggerated in light of the evidence. The ALJ is not required to give subjective evidence precedence over objective evidence. 20 C.F.R. §§ 404.1529, 416.929; Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990). Furthermore, "a factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence." Villa, 895 at 1024.

Here, the ALJ did not just make a conclusory finding regarding Wallace's credibility regarding his headaches, or fail to support that finding.  The ALJ properly applied the applicable law and regulations. She cited to the medical evidence, his ability to work, and statements made by Wallace in regard to his daily activities. It is appropriate for the court to consider the daily activities and ability to work despite pre-existing conditions. See Leggett, 67 F.3d at 565, n. 12; Fraga v. Bowen, 810 F.2d 1296, 1305, n. 11 (5th Cir. 1987).

Wallace argues that the ALJ erred in relying on Wallace's work through ANPPM as a basis to find Wallace not credible and "not as disabled as he alleged," particularly as time recordings show that he did not work the full twenty hours per

26

week. (Doc. 15, citing doc. 9-1, p. 17).  Wallace admitted he was scheduled to work "4 days a week about 4 hours a day," for a total of sixteen hours per week. (Doc. 15; Doc. 9-1, p. 30). The letter from AANPM, regarding Wallace's work through the program, stated that Wallace was a participant working 18 hours per week. (Doc. 9-1, p. 171). And the time records show that Wallace only took sick leave once for a total of five hours during his year of work. (Doc. 9-1, p. 173).

Wallace cites to <u>Newton v. Apfel</u>, 209 F.3d 448, 455, n. 3 (5th Cir. 2000) for the proposition that the ability to work part-time and only if medicated for pain is not evidence of the individual's ability to work. However, that case concerned a closed period of disability claimed from May 1989 to September 1994, and the Court was saying that the ALJ's reliance on the claimant's ability to work from late 1994 through January 1995 was inappropriate, as the claimant's ability to work *after* the claimed disability period was not evidence that the claimant could have worked *during* the claimed disability period. In Wallace's case, he claimed an initial onset date of disability as October 12, 2012, later amended to May 14, 2013. But the time records from ANPPM show that he was working from at least May 15, 2013 through May 14, 2014, *during* the time period he claimed disability. Furthermore, the same evidence cited in the ALJ's RFC finding demonstrates that the credibility finding is supported by substantial evidence.

The ALJ cited Wallace's testimony, reports to his physicians, and application materials. She referred to his testimony that his biggest problems were his back and headaches, and that he received some relief following injections, his medication use,

and time to rest. The ALJ also noted his daily activities. The ALJ detailed Wallace's subjective complaints and objective medical evidence, and found that the evidence did not support Wallace's allegations. (Doc. 9-1, p. 17). And although Wallace disagrees with the ALJ's interpretation of the August 2012 note about Wallace receiving pain medications from both doctors and requesting refills more frequently than prescribed, the Court may not reweigh the evidence and substitute its judgment for the ALJ.

Furthermore, as substantial evidence supports the ALJ's step four decision, Wallace's claim that he would disabled under the Medical-Vocational Guidelines if limited to only sedentary work is moot, since if it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.

## III.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Wallace's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___23rd___ day of June, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge